**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN M. SCHUBERTH, Derivatively and on Behalf of FRANKLIN BSP REALTY TRUST, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD J. BYRNE, JEROME S. BAGLIEN, MICHAEL COMPARATO, PAT AUGUSTINE, JOE DUMARS, JAMIE HANDWERKER, PETER J. MCDONOUGH, BUFORD H. ORTALE, and ELIZABETH K. TUPPENY,<br><br>Defendants,<br><br>and<br><br>FRANKLIN BSP REALTY TRUST, INC.,<br><br>Nominal Defendant. | Case No.<br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff John M. Schuberth, by his undersigned attorneys, derivatively on behalf of Nominal Defendant Franklin BSP Realty Trust, Inc. ("FBRT" or the "Company"), files this Verified Shareholder Derivative Complaint against Richard J. Byrne ("Byrne"), Jerome S. Baglien ("Baglien"), Michael Comparato ("Comparato"), Pat Augustine ("Augustine"), Joe Dumars ("Dumars"), Jamie Handwerker ("Handwerker"), Peter J. McDonough ("McDonough"), Buford H. Ortale ("Ortale"), and Elizabeth K. Tuppeny ("Tuppeny") (collectively, the "Individual Defendants," and with the Company, "Defendants") for breaches of their fiduciary duties as directors and/or officers of FBRT.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and FBRT, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding FBRT, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Eastern District of New York captioned *In Re Franklin BSP Realty Trust, Inc. Securities Litigation,* 1:26-cv-01107-GRB (E.D.N.Y) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action brought in the right, and for the benefit, of FBRT against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from November 5, 2024 through at least February 11, 2026, (the "Relevant Period"), and have caused, and continue to cause, substantial harm to FBRT and its shareholders, including monetary losses and damages to FBRT's reputation and goodwill.

2. Incorporated in Maryland and headquartered in New York, FBRT is a publicly traded real estate investment trust ("REIT") engaged in the origination, acquisition, and management of commercial real estate debt investments secured by properties across the United States. The Company conducts its operations through two primary segments: (1) Commercial Real Estate Financing, and (2) the Company's Agency Business.

3. The Company's Commercial Real Estate Financing segment engages in the origination, acquisition, and management of commercial real estate debt investments, including first mortgage loans and subordinated mortgage loans.

4. The Company conducts its Agency Business through the origination, sale, and servicing of multifamily finance products offered under programs sponsored by government-sponsored enterprises and government agencies. This sustained sales growth was critical to FBRT's valuation because FBRT's overall revenue base was materially smaller than that of its principal competitors.

5. Prior to and throughout the Relevant Period, the Company consistently maintained a dividend of $0.355 per share, including during fiscal years 2024 and 2025.

6. Throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning the Company's ability to sustain its dividend through future earnings. By way of example, on November 5, 2024, the Company conducted an earnings call regarding its financial results for the third quarter of 2024 (the "3Q 2024 Earnings Call"). During the 3Q 2024 Earnings Call, the following exchange occurred concerning the Company's dividend:

> Analyst: And then kind of last one for me, maybe on dividend coverage. We understand the lag between repayments and originations and that flowing through to net interest income. But how long do you think it takes to redeploy your capital back into loans to the point where your DE is fully covering dividends?
>
> Defendant Baglien: Yes, Tom. This is really an REO story. As soon as we get the REO gone and get it back into loans, we're back at coverage. This is -- we largely expected there to be a little bit of noise in the numbers as we cycled through kind of this REO and get it sold. But we're -- we could not be more confident in the earnings power of the platform once we get through this and stabilize. The answer is we want to get there as fast as we can. Obviously, the market is going to dictate that timing as much as we are. I would have told you 70 basis points ago on the 10-year that we were going to get through it a little bit faster. Things might slow a little bit here, but we'll get through it all. We will get back there. And obviously, the goal is to get back there as soon as possible. But this is entirely an REO conversation,

> not a lack of investable or originate able opportunities.
>
> Defendant Byrne: And Tom, sorry to pile on, Mike and I talk about this every day, so we're all like-minded on this. ***We and our Board set our dividend policy based on our earnings power look. And we like to look at that not over like a quarter at a time, but what the earnings power of the company is***. And so whether that takes one quarter or takes a little longer, not really a consideration. And as far as REO as well, remember, we have $350 million of cash. ***We have a lot more earnings power than we're demonstrating now, and we feel confident in the level of our dividend***.[1]

7. On July 31, 2025, the Company hosted an earnings call to discuss its financial results for the second quarter of 2025 (the "2Q 2025 Earnings Call"). During the 2Q 2025 Earnings Call, Defendant Baglien addressed the measures the Company was undertaking to preserve its $0.355 per share dividend and stated, in relevant part, as follows:

> FBRT reported GAAP earnings of $24.4 million or $0.21 per fully converted common share. Distributable earnings for the quarter was $29 million or $0.27 per fully converted share. ***Our Board determined it was appropriate to maintain the second quarter dividend at the current level of $0.355.***
>
> We believe there are 3 key drivers to get us to dividend coverage. ***First, we plan to call several CLOs that are now past their reinvestment periods and are no longer providing optimal leverage. We believe this will generate approximately $0.04 to $0.06 per share quarterly by creating liquidity and freeing up equity in those CLOs for us to reinvest.***
>
> Second, we expect to reinvest the equity currently allocated to our REO portfolio and REO financings. As we continue to sell assets and recycle that capital into new originations, ***we estimate this could contribute approximately $0.08 to $0.12 per share per quarter to distributable earnings.***
>
> ***Third and lastly, we expect the contribution from NewPoint to grow meaningfully over time. Once it begins to reach scale on origination volume, BSP loan servicing is integrated, and we realize the cost savings from the platform synergies, we believe NewPoint can deliver an 8% ROE or better, and that would generate approximately $0.08 per share in quarterly earnings contribution.***

8. The truth was disclosed on February 11, 2026, after market close, when the Company issued a press release entitled "Franklin BSP Realty Trust, Inc. Announces Fourth

[1] Unless expressly stated otherwise, all emphasis herein has been added.

Quarter and Full Year 2025 Results" (the "FY 2025 Earnings Press Release"). In the FY 2025 Earnings Press Release, Defendant Comparato stated that the Company had reduced its dividend to $0.20 per share to "stabilize our book value and match the earnings power of our company to distributions." The FY 2025 Earnings Press Release further provided, in relevant part:

> 2025 was a year of transition for FBRT. We have diversified our business lines with the NewPoint acquisition and we have been sorting through the remaining legacy 2021 and 2022 assets. ***While we have managed through the credit cycle with minimal losses, it has taken longer to resolve and sell the real estate than we originally planned. This has led to over-distributing capital to investors. In order to stabilize our book value and match the earnings power of our company to distributions, our Board reset the quarterly dividend to $0.20.*** Our earnings power to support a meaningfully higher dividend remains unchanged, and the team is working tirelessly to position us for higher earnings. In the near term, our priority is delivering durable book value growth and matching our yields to our distributions.

9. The following day, the Company conducted an earnings call to discuss its financial results for 2025 (the "FY 2025 Earnings Call"). During the FY 2025 Earnings Call, Defendant Comparato further addressed the Company's decision to reduce the dividend and stated as follows:

> Now on to the company. ***For several quarters, we have discussed our earnings under covering our dividend. After a thoughtful analysis, we decided it was no longer prudent to sacrifice book value to pay that dividend. Accordingly, management has recommended and the Board has approved a reset of the quarterly dividend to $0.20 per common share beginning the first quarter of 2026***. The company continues to have earnings power to support a meaningfully higher dividend than $0.20. That has not changed. But in the near term, rather than returning capital to shareholders by over distributing, we want to stabilize our book value and better match our current earnings to our dividend.
>
> Our priorities are sustainable dividend coverage, book value growth and building more consistent durable earnings. The dividend reset is driven by several factors. ***The recent declines in SOFR, the timing of our originations and repayments and the overall size of our loan portfolio has impacted short-term returns. In addition, spreads are at multi-decade tights, which means that new loans coming into the portfolio are generally making lower returns than loans that are paying off. REO liquidations are taking longer than originally anticipated, keeping equity locked in underperforming investments***.

10. Following this announcement, the price of the Company's common stock declined by approximately $1.44 per share, or 14.2%, falling from a closing price of approximately $10.15

per share on February 11, 2026, to a closing price of approximately $8.71 per share on February 12, 2026.

11. Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements and omitted material facts concerning FBRT's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to shareholders and investors, among other things, that: (1) the Company's future earnings power was overstated; and (2) consequently, the Company overstated its ability to sustain its dividend. As a result of the foregoing omissions and misstatements, the Company's public statements were materially false and misleading throughout the Relevant Period.

12. The Individual Defendants failed to correct, and/or caused the Company to fail to correct, these materially false and misleading statements and omissions of material fact, thereby rendering themselves personally liable to the Company for breaches of their fiduciary duties.

13. Furthermore, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls.

14. Moreover, the Individual Defendants further breached their fiduciary duties by causing FBRT to repurchase its own shares of stock at prices that were artificially inflated as a result of the Individual Defendants' false and misleading statements. Between October 2025 and February 2026, the Company repurchased approximately 1.9 million shares of its common stock for more than $19.1 million. Given that the Company's stock was trading at $8.71 per share on February 12, 2026, FBRT overpaid by approximately $2.5 million in total.

15. As a direct result of this misconduct, the Company is now a defendant in the Securities Action.

16. The Securities Action has subjected the Company to internal investigations, losses

from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants. It will likely cost the Company millions of dollars going forward and the Company's damages continue to accrue as a result of the wrongdoing alleged herein.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Action based on violations of the Exchange Act.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20. This action is not a collusive action designed to confer jurisdiction on a court of the United States that would not otherwise have

21. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

22. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District, and Sprouts is headquartered in this District.

## PARTIES

***Plaintiff***

23. Plaintiff is, and has been at all relevant times, a shareholder of FBRT.

***Nominal Defendant***

24. Nominal Defendant FBRT is incorporated under the laws of Maryland, with its principal executive office located at 1 Madison Ave, Suite 1600, New York, New York 10010. FBRT common trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FBRT".

***Director Defendants***

**Defendant Byrne**

25. Defendant Byrne has served as Chairman of the Board since February 2026. Prior to assuming that role, he served as the Company's Chief Executive Officer from 2016 through February 2026.

26. The Company's 2026 Proxy Statement that was filed with the SEC on April 17, 2026 (the "2026 Proxy Statement") stated the following about Defendant Byrne:

> **Relevant Experience**
>
> 2013-Present: Benefit Street Partners
>
> - President
> - In his role as President, he serves as Chairman of Franklin BSP Realty Trust (and as CEO from 2016 through February 10, 2026) and CEO of Franklin BSP Capital Corp.

1999-2013: Deutsche Bank

- 2008-2013: Chief Executive Officer, Deutsche Bank Securities, Inc.
- 2006-2013: Global Co-Head of Capital Markets at Deutsche Bank
- 2001-2010: Member of the Global Banking Executive Committee and the Global Markets Executive Committee

1985-1999: Merrill Lynch & Co.

- Global Co-Head of the Leveraged Finance Group and Global Head of Credit Research

**Qualifications:**

Mr. Byrne's current and prior experience as a director and prior experience as Chief Executive Officer of the Company, and his significant investment banking experience in real estate finance make him well qualified to serve as a member of our Board.

**Current Public Company Boards:**
Wynn Resorts, Ltd.
Franklin BSP Real Estate Debt, Inc. (non-listed)

**Affiliated, Non-Listed BDC Boards*:**
Franklin BSP Capital Corp.

**Previous Public Company Boards:**
MFA Financial, Inc.

** Affiliated non-traded Business Development Company ("BDC") regulated under the Investment Company Act of 1940 that are managed by the Advisor.*

27. According to the Proxy Statements filed by the Company on April 15, 2025 (the 2025 Proxy Statement") and the 2026 Proxy Statement, Defendant Byrne received total compensation of $1,577,585 and $1,365,994 in 2024 and 2025 respectively.

28. As of April 1, 2025, Defendant Byrne beneficially owned 451,091 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, Byrne's holdings were valued at approximately $5,742,388.43. By April 3, 2026, Byrne beneficially owned 298,884

shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, Byrne's holdings were valued at approximately $2,525,569.80.

**Defendant Augustine**

29. Defendant Augustine has been a member of the Company's Board of Directors since 2021 and currently serves on both the Compensation Committee and the Nominating and Corporate Governance Committee.

30. The Company's 2026 Proxy Statement stated the following about Defendant Augustine:

**Relevant Experience**

2011-Present: Meridian Enterprises

- Founder
- Built, owned, and operated Planet Fitness franchises before selling to a private equity firm

2009-2011: Swiss RE Insurance Asset Management

- Head of Structured Product and Credit Portfolio Management

1996-2007: NationsBank (predecessor to Bank of America)

- Head of sales, trading, and research for structured products

1985-1996: Salomon Brothers

- Mortgage-backed securities trader

**Qualifications:**

Mr. Augustine's experience founding a company and his tenure in the financial industry, specifically his experience in both residential and commercial real estate, make him well qualified to the Board.

**Previous Public Company Boards:**
Capstead Mortgage Corporation

31. According to the 2025 and 2026 Proxy Statements, Defendant Augustine received total compensation of $240,000 and $240,000 in 2024 and 2025 respectively:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| **2024** | $130,000 | $110,000 | $240,000 |
| **2025** | $130,000 | $110,000 | $240,000 |

32. As of April 1, 2025, Defendant Augustine beneficially owned 26,191 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, Augustine's holdings were valued at approximately $333,511.43. By April 3, 2026, Augustine beneficially owned 36,277 shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, Augustine's holdings were valued at approximately $306,540.65.

**Defendant Dumars**

33. Defendant Dumars has been a member of the Company's Board of Directors since 2023 and currently serves on both the Audit Committee and the Nominating and Corporate Governance Committee.

34. The Company's 2026 Proxy Statement stated the following about Defendant Dumars:

> **Relevant Experience**
>
> 2022-Present: National Basketball Association ("NBA")
>
> - EVP and Head of Basketball Operations
>
> 2020-2022: Sacramento Kings NBA franchise
>
> - Chief Strategy Officer
>
> 2017-2019: Independent Sports & Entertainment, LLC
>
> - President of Basketball Division
>
> 1999-2014: Detroit Pistons NBA Franchise
>
> - President of Basketball Operations
>
> 1985-1999: Detroit Pistons

- Professional basketball player
- Six-time NBA All-Star

**Qualifications:**

Mr. Dumars is an experienced executive, owner, and operator of multiple businesses with a track record of accomplishments based on individual contribution, leadership and team building. Mr. Dumars' operational expertise and experience in corporate strategy development and human capital management make him well qualified to serve as a member of our Board.

35. According to the 2025 and 2026 Proxy Statements, Defendant Dumars received total compensation of $240,000 and $240,000 in 2024 and 2025 respectively:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| **2025** | $130,000 | $110,000 | $240,000 |
| **2026** | $130,000 | $110,000 | $240,000 |

36. As of April 1, 2025, Defendant Dumars beneficially owned 16,571 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, Dumars' holdings were valued at approximately $210,948.83. By April 3, 2026, Dumars beneficially owned 26,607 shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, Dumars' holdings were valued at approximately $224,829.15.

**Defendant McDonough**

37. Defendant McDonough has been a member of the Company's Board of Directors since 2016 and currently serves as Chair of the Nominating and Corporate Governance Committee, and is a member of the Audit Committee and the Compensation Committee.

38. The Company's 2026 Proxy Statement stated the following about Defendant McDonough:

**Relevant Experience**

2018-2022: Trait Biosciences

- Chief Executive Officer

- Trait Biosciences is a biotechnology research organization developing Intellectual Property associated with the formulation of CBD Health & Wellness Products

<u>2006-2015: Diageo</u>

- President, Chief Marketing and Innovation Officer

<u>2004-2006: Procter & Gamble</u>

- Vice President of European Marketing overseeing the brand marketing function for Duracell Batteries and Braun Appliances

<u>2002-2004: University of Canterbury, Graduate School of Commerce</u>

- University lecturer and management consultant

<u>1994-2002: Gillette</u>

- Vice President of North American Marketing
- Launched industry leading brands such as Mach3 Turbo and Venus Razors.

<u>1990-1994: Black & Decker</u>

- Director of North American Marketing
- Launched the DeWalt Power Tool Company

**Qualifications:**

Mr. McDonough brings innovative thinking to transform business performance from diverse experiences leading global organizations in numerous industries and prior experience serving as an independent director on corporate boards. Mr. McDonough earned his MBA from the Wharton School of Business and received his BS from Cornell University. We believe Mr. McDonough's extensive experience as an executive officer and/or director and his significant business accomplishments make him well qualified to serve as a member of our Board.

**Current Public Company Boards:**
Franklin BSP Real Estate Debt, Inc.
(non-listed)

**Previous Public Company Boards:**
The Splash Beverage Group

**Current Private Company Boards:**
2024-Present: Bedoukian Research Inc.

39. According to the 2025 and 2026 Proxy Statements, Defendant McDonough received total compensation of $260,000 and $260,000 in 2024 and 2025 respectively:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| **2024** | $150,000 | $110,000 | $260,000 |
| **2025** | $150,000 | $110,000 | $260,000 |

40. As of April 1, 2025, Defendant McDonough beneficially owned 37,390 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, McDonough's holdings were valued at approximately $475,974.70. By April 3, 2026, McDonough beneficially owned 47,426 shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, McDonough's holdings were valued at approximately $400,749.70.

**Defendant Ortale**

41. Defendant Ortale has been a member of the Company's Board of Directors since 2016 and currently serves as Chair of the Audit Committee and is a member of both the Compensation Committee and the Nominating and Corporate Governance Committee.

42. The Company's 2026 Proxy Statement stated the following about Defendant Ortale:

**Relevant Experience**

2018-Present: NTR

- Partner
- NTR is a private equity firm focused on the energy space

2010-Present: Armour Capital Management, LP

- Partner
- Armour is the external manager of a residential mortgage REIT with over $15 billion in assets

1996-Present: Sewanee Ventures

- Founder and Manager

- Sewanee Ventures is a private investment vehicle focused on investments in real estate, venture capital, and private equity

1993-1996: NationsBanc (Bank of America)

- Founder and Managing Director of the High Yield Bond Group

1987-1991: Merrill Lynch Merchant Banking Group

- Vice President

**Qualifications:**

Mr. Ortale's expertise includes investments in startup venture backed companies, LBO's, real estate development and acquisitions and private debt. We believe Mr. Ortale's extensive experience as a private equity investor and banker make him well qualified to serve as a member of our Board.

**Current Public Company Boards:**
Franklin BSP Real Estate Debt, Inc. (non-listed)

**Previous Public Company Boards:**
ASAP

43. According to the 2025 and 2026 Proxy Statements, Defendant Ortale received total compensation of $260,000 and $260,000 in 2024 and 2025 respectively:

| Fiscal Year | Feeds Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| **2024** | $150,000 | $110,000 | $260,000 |
| **2025** | $150,000 | $110,000 | $260,000 |

44. As of April 1, 2025, Defendant Ortale beneficially owned 40,815 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, Ortale's holdings were valued at approximately $519,574.95. By April 3, 2026, Ortale beneficially owned 64,851 shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, Ortale's holdings were valued at approximately $547,990.95.

**Defendant Tuppeny**

45. Defendant Tuppeny has been a member of the Company's Board of Directors since 2013 and currently serves on the Audit Committee, the Compensation Committee, and the

Nominating and Corporate Governance Committee. Tuppeny is also listed as the Lead Independent Director on the Company website.

46. The Company's 2026 Proxy Statement stated the following about Defendant Tuppeny:

**Relevant Experience**

1993-Present: Domus, Inc.

- Founder and Chief Executive Officer
- Domus works at the C-Suite level with clients such as Chevron; Citibank; ConAgra; Diageo; DuPont; Epson; Mattel; Merck; Merrill Lynch; Procter & Gamble; Ralph Lauren and Westinghouse

1992-1993: Earle Palmer Brown

- Executive Vice President of Business Development

1984-1992: Weightman Advertising

- Senior Vice President

**Qualifications:**

Ms. Tuppeny has 40 years of experience in the branding and advertising industries, with a focus on Fortune 50 companies. We believe that Ms. Tuppeny's experience as a Chief Executive Officer and an independent director of multiple companies, as well as her track record in evaluating real estate business development applications, make her well qualified as a member of our Board.

**Current Public Company Boards:**
National Healthcare Properties
American Strategic Investment Co. (formerly New York City REIT, Inc.)
Franklin BSP Real Estate Debt, Inc. (non-listed)

**Previous Public Company Boards:**
American Realty Capital Trust IV

47. According to the 2025 and 2026 Proxy Statements, Defendant Tuppeny received total compensation of $280,000 and $280,000 in 2024 and 2025 respectively:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **2024** | $170,000 | $110,000 | $280,000 |
| **2025** | $170,000 | $110,000 | $280,000 |

48. As of April 1, 2025, Defendant Tuppeny beneficially owned 39,871 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, Tuppeny's holdings were valued at approximately $507,557.83. By April 3, 2026, Tuppeny beneficially owned 49,907 shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, Tuppeny's holdings were valued at approximately $421,714.15.

**Defendant Handwerker**

49. Defendant Handwerker was a member of the Company's Board of Directors from 2016 until 2026. Handwerker served as the Chair of the Compensation Committee, and as a member of the Audit Committee, and the Nominating and Corporate Governance Committee.

50. According to the 2025 and 2026 Proxy Statements, Defendant Handwerker received total compensation of $260,000 and $260,000 in 2024 and 2025 respectively:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| **2024** | $150,000 | $110,000 | $260,000 |
| **2025** | $150,000 | $110,000 | $260,000 |

51. As of April 1, 2025, Defendant Handwerker beneficially owned 37,408 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, Handwerker's holdings were valued at approximately $476,203.84. By April 3, 2026, Handwerker beneficially owned 47,444 shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, Handwerker's holdings were valued at approximately $400,901.80.

***Officer Defendants***

**Defendant Baglien**

52. Defendant Baglien ("Baglien") has served as FBRT's Chief Financial Officer since September 2016 and as the Company's Chief Operating Officer since December 2021.

53. The Company's 2026 Proxy Statement stated the following about Defendant Baglien:

> Jerome S. Baglien has served as Chief Financial Officer of the Company since September 2016, and as Chief Operating Officer of the Company since December 2021. Mr. Baglien is a Managing Director and Chief Financial Officer of Real Estate of the Advisor. Prior to joining the Advisor in 2016, Mr. Baglien was director of fund finance for GTIS Partners LP ("GTIS"), where he oversaw all finance and operations for GTIS funds. Previously, he was an accounting manager at iStar Inc. with oversight of loans and special investments. Mr. Baglien received a Masters of Business Administration from Kellstadt Graduate School of Business at DePaul University and a Bachelor of Science in Accounting from the University of Oregon.

54. According to the 2025 and 2026 Proxy Statements, Defendant Baglien received total compensation of $1,165,326 and $1,000,004 in 2024 and 2025 respectively.

55. As of April 1, 2025, Defendant Baglien beneficially owned 237,017 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, Baglien's holdings were valued at approximately $3,017,226.41. By April 3, 2026, Baglien beneficially owned 123,670 shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, Baglien's holdings were valued at approximately $1,045,011.50.

**Defendant Comparato**

56. Defendant Comparato has served as the Company's CEO since February 2026. Prior to assuming that role, he served as the Company's President from March 2023 through February 2026.

57. The Company's 2026 Proxy Statement that was filed with the SEC on April 17, 2026 (the "2026 Proxy Statement") stated the following about Defendant Comparato:

> Michael Comparato was appointed in February 2026 as Chief Executive Officer of the Company. He previously served as President of the Company from March 2023 to February 2026. He is a Managing Director and Head of Commercial Real Estate for the Advisor. Since the Advisor took over the role of external manager of the

> Company, Mr. Comparato has played a leading role for the Advisor in fulfilling its duties under the Advisory Agreement, including overseeing loan originations and other investments. Prior to joining the Advisor in 2015, Mr. Comparato was Head of U.S. Equity Investments at Ladder Capital Corp., where he led Ladder's largest team that actively originated CMBS loans, structured/balance sheet loans, and mezzanine loans and acquired strategic assets for the firm. Prior to joining Ladder, Mr. Comparato was President of BankAtlantic Commercial Mortgage Capital (BACMC), the CMBS affiliate of BankAtlantic, where he was responsible for managing all day-to-day operations. Mr. Comparato also previously ran Compson Holding Corporation, which made various equity investments in multiple different commercial real estate assets and publicly traded REITs. Mr. Comparato received a Bachelor of Science, Summa Cum Laude, from Babson College.

58. According to the 2025 and 2026 Proxy Statements, Defendant Comparato received total compensation of $1,747,984 and $1,574,961 in 2024 and 2025 respectively.

59. As of April 1, 2025, Defendant Comparato beneficially owned 471,614 shares of FBRT common stock. Based on FBRT's stock price of $12.73 per share on that date, Comparato's holdings were valued at approximately $3,017,226.41. By April 3, 2026, Comparato beneficially owned 312,154 shares of FBRT common stock. Based on FBRT's stock price of $8.45 per share on that date, Comparato's holdings were valued at approximately $2,637,701.30.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

60. By reason of their positions as officers, directors, and/or fiduciaries of FBRT, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed FBRT and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

61. The Individual Defendants were and are required to use their utmost ability to control and manage FBRT in a fair, just, honest, and equitable manner.

62. The Individual Defendants were and are required to act in furtherance of the best interests of FBRT and its shareholders to benefit all shareholders equitably.

63. Each director and officer of the Company owes FBRT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

64. As fiduciaries of FBRT, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

65. The officers and directors of FBRT were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

66. Each Individual Defendant under their position as officers and directors of FBRT owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

67. As FBRT's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

68. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

69. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that it failed to disclose so

that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

70. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

(a) Ensure the Company's affairs were managed efficiently and in a business-like manner to achieve the highest quality performance;

(b) Ensure the Company operated diligently, honestly, and prudently, in full compliance with all applicable district and state laws, rules, regulations, and contractual obligations, and acted strictly within its legal authority;

(c) Ensure that communications with the public and shareholders were timely, complete, and made with candor; and

(d) Upon notice of issues concerning the Company's business practices or operations, act in good faith to take appropriate measures to correct the misconduct and prevent its recurrence.

71. Each of the Individual Defendants also bore a duty of loyalty to FBRT and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

72. During the pertinent times, the Individual Defendants served as agents for each other and for FBRT, always operating within the parameters of their agency.

73. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within FBRT, were privy to detrimental, confidential information concerning the Company.

**FRANKLIN BSP REALTY TRUST INC.**
**CODE OF ETHICS**

74. In addition to the fiduciary duties numerated above, the Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with FBRT's Code of Ethics (the "Code of Ethics"). The Code of Ethics states, in pertinent part, the following:

> **Statement of Purpose**
>
> The purpose of this Code of Ethics (this "Code") is to reaffirm the strong commitment of Franklin BSP Realty Trust, Inc. (together with its subsidiaries, the "Company") to the highest standards of legal and ethical conduct in its business practices, to provide general direction regarding acceptable standards of operation, and to encourage directors, officers, external advisors and employees of external advisors performing substantial services for the Company (individually and/or collectively, a "Subject Person" or "Subject Persons") to seek further clarification when questions about ethical conduct arise.
>
> The Company's Board of Directors (the "Board") believes this Code should be an evolving set of conduct guidelines and ethics, subject to modification from time to time as circumstances warrant. Any waiver of this Code must be in accordance with the provisions of this Code set forth under "Waiver of the Code of Ethics."
>
> **General Ethical Requirements**
>
> Subject Persons should read this Code with the following in mind:
>
> The Company requires that every Subject Person comply with these standards. With respect to the Company's external advisor and employees of the external advisor, this Code is complementary of, and supplemental to, other policies and procedures of the external advisor. In the event an employee of the external advisor believes that complying with this Code will conflict with the code of ethics or any other policy of the external advisor, the employee shall bring the matter to the attention of the Company's General Counsel ("General Counsel") who shall consider whether pursuing a waiver of this Code, in accordance with the procedures set forth below, is necessary.
>
> This policy does not identify every type of activity that might give rise to a question about ethical conduct. The Company encourages Subject Persons who have questions to discuss them with his or her manager or, as appropriate and applicable, the General Counsel. Each Subject Person of the Company is expected and required to:

1. Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.

2. Provide information that is accurate, complete, objective, relevant, timely and understandable.

3. Comply, both in letter and in spirit, with rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies. Although not all Subject Persons are expected to know the details of all applicable laws, it is important to be aware when to seek advice from appropriate Company personnel.

4. Act in good faith, responsibly, competently, diligently and with due care, without misrepresenting material facts or allowing their independent judgment to be subordinated.

5. Respect the confidentiality of information acquired in the course of work except when authorized or otherwise legally obligated to disclose such information. Confidential information acquired in the course of work should not be used improperly for personal advantage.

6. Work collaboratively and maintain skills that are important and relevant to the Company's needs.

7. Proactively promote ethical behavior as a responsible colleague among peers in his or her work environment and community.

8. Achieve responsible use of and control over all Company assets and resources employed or entrusted to him or her.

**Responsible Behavior**

Subject Persons of the Company are expected to exhibit a high degree of personal integrity at all times. This not only involves sincere respect for the rights and feelings of others, but also demands that Subject Persons refrain from any behavior that might be harmful to themselves, their co-workers, or the Company, or that might be viewed unfavorably by current or potential tenants or clients, or by the public at large. Because their conduct reflects on the Company, Subject Persons are encouraged to observe the highest standards of professionalism at all times.

**Consequences of Failure to Comply**

All Subject Persons must conform to ethical and legal standards in order to abide by the law and to preserve the Company's integrity and reputation. Failure to adhere to this Code may result in disciplinary action, up to and including

termination of employment.

**Reporting Violations**

All Subject Persons should be alert and sensitive to situations that could result in actions by themselves, other Subject Persons or third parties that might violate the standards of conduct set forth in this Code or applicable U.S. laws. Any Subject Persons who knows or believes that another Subject Persons or agent of the Company has engaged or is contemplating or engaging in improper conduct contrary to Company policy or in any illegal activity is encouraged to report such information.

Generally, such matters should be raised first with a Subject Person's immediate supervisor or an officer of the Company, such as the General Counsel, Chief Operating Officer ("COO"), Chief Financial Officer ("CFO") or Chief Executive Officer ("CEO"). This may provide valuable insights or perspectives and encourage resolution of problems within the appropriate work unit. However, a Subject Person who would not be comfortable raising a matter with his or her immediate supervisor or an officer of the Company, or who does not believe such person will deal with the matter properly, should communicate the matter in accordance with the Company's Whistleblower Policy. All communications pursuant to this paragraph shall be confidentially processed. Subject Persons may freely report such information, in name or anonymously as they deem appropriate.

Notwithstanding anything to the contrary herein or therein, nothing in this Code or in any other Company policy or agreement that a Subject Person, or any former Subject Person, may have with the Company or any of its affiliates, including any employment, severance, confidentiality or similar agreement, is intended to or does restrict or prohibit a Subject Person from reporting possible violations of law or regulation directly to, or from filing a claim or assisting with an investigation directly with, a self regulatory authority or a government agency or entity, including without limitation the U.S. Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board, the Department of Justice, the Securities and Exchange Commission, Congress, and any agency Inspector General, or from making other disclosures that are protected under the whistleblower provisions of state or federal law or regulation ("Protected Disclosures"), whether such disclosures are made as a result of a Subject Person initiating communications directly with or responding to any inquiries from such government agency or entity. Subject Persons do not need the prior authorization of the Company or the external advisor to make Protected Disclosures and do not need to notify the Company that they have made Protected Disclosures.

* * *

**Insider Trading of Securities**

All Subject Persons shall comply with the Company's Insider Trading

Policy.

* * *

**Corporate Funds**

Subject Persons are forbidden to use, directly or indirectly, corporate funds and assets for any unlawful or improper purpose or to accomplish any unlawful or improper goal. The Company also prohibits the establishment or maintenance of undisclosed or unrecorded funds and assets and the willful improper accounting of funds and assets. The Company requires all Subject Persons who handle funds and assets of the Company to so in compliance with all (a) of the Company's policies in effect from time to time, (b) all governmental laws, rules, regulations and orders and (c) generally accepted accounting principles.

**SEC Filings**

Each Subject Person of the Company shall endeavor to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company. Each Subject Person of the Company involved in preparing or reviewing SEC filings and other public communications made by the Company shall be responsible for ensuring that to such Subject Person's knowledge, such filings or other communications do not contain any inaccuracy, material misstatement or omission of any information necessary to make the statements made not misleading.

**Record-Keeping**

The Company's books, records, accounts and financial statements must be timely maintained in reasonable detail and must completely and accurately reflect the Company's assets, liabilities and transactions, conforming to applicable legal requirements and financial policies and procedures of the Company's internal controls systems. No transaction shall be carried out in a manner such that the substance of the transaction is obscured or recorded improperly.

If a Subject Person has any concerns with accounting or auditing matters, the Subject Person should report them to the General Counsel or the Chair of the Audit Committee of the Company's Board.

**FRANKLIN BSP REALTY TRUST, INC.**
**CORPORATE GOVERNANCE GUIDELINES**

75. Moreover, the Director Defendants have additional fiduciary duties as described in FBRT's Corporate Governance Guidelines, which were adopted "to advance the functioning

of the Board and its committees and set forth the Board's expectations as to how it should perform its functions."

76. The Guideline states, in relevant part:

> The Board of Directors (the "Board") of Franklin BSP Realty Trust, Inc., a Maryland corporation (the "Company"), has adopted the following Corporate Governance Guidelines (the "Guidelines") to advance the functioning of the Board and its committees and set forth the Board's expectations as to how it should perform its functions.
>
> * * *
>
> **Board Responsibility/Role of Board**
>
> The business and affairs of the Company shall be managed under the direction of the Board.
>
> Each director is expected to attend Board meetings and meetings of committees on which he or she serves, prepare for meetings, review relevant materials, ask questions and engage in discussion, and spend the time needed and meet as frequently as necessary to properly discharge his or her duties. Participation by video conference, conference telephone or other communications equipment is appropriate in the event of scheduling conflicts or when the Board otherwise deems it to be necessary or desirable. A director who is unable to attend a meeting (which it is understood will occur on occasion) is expected to notify the Chairman of the Board or the Chairman of the appropriate committee in advance of such meeting.
>
> Directors should be familiar with the Company's business, its financial statements and capital structure, and the risks and competition it faces, to facilitate active and effective participation in the Board and committee meetings they attend. Directors are expected to maintain an attitude of constructive involvement and oversight; they are expected to ask incisive, probing questions and require accurate, honest answers; they are expected to act with integrity and diligence; and they are expected to demonstrate a commitment to the Company, its values, its business plan and long-term stockholder value.
>
> The Board directs and oversees the management of the business and affairs of the Company in a manner consistent with the best interests of the Company. The Board's responsibility is one of oversight; and in performing its oversight role, the Board serves as the ultimate decision-making body of the Company, except for those matters reserved to or shared with the stockholders. Directors rely on the competence and integrity of the Company's officers and its external advisor, Benefit Street Partners, L.L.C. (the "Advisor"), in carrying out their responsibilities. Subject to the oversight of the Board, it is the responsibility of the Company's officers and the Advisor to operate the Company in an effective and ethical manner

in order to produce value for stockholders.

* * *

**AUDIT COMMITTEE CHARTER**

77. In addition to the duties above, under the Company's Audit Committee Charter, as members of the Audit Committee during the Relevant Period, Defendants Ortale (Chair), Dumars, McDonough, and Tuppeny (collectively the "Audit Committee Defendants") owed specific additional duties to FBRT. Pursuant to the Charter, the purpose of the Audit Committee is as follows:

> **Purpose of the Committee**
>
> The Audit Committee (the "Committee") is a committee of the Board of Directors (the "Board") of Franklin BSP Realty Trust, Inc. (the "Company"). Among other things, the Committee is responsible for oversight of the independent registered public accounting firm engaged the purpose of preparing or issuing an audit report as to the Company's financial statements, or performing other audit, review or attest services for the Company (the "independent auditor") and Company's internal auditor, as applicable, who shall report directly to the Committee. The Committee shall assist the Board in undertaking and fulfilling its responsibilities in monitoring (i) the Company's financial reporting process, (ii) the integrity of the Company's financial statements, (iii) the Company's compliance with legal and regulatory requirements, (iv) the independence and qualifications of the Company's independent and internal auditors, as applicable, (v) the performance of the Company's independent and internal auditors, as applicable, (vi) the performance of the Company's systems of internal control over financial reporting and disclosure controls and procedures, and (vii) the Company's risk assessment, risk management and risk mitigation policies and programs, including matters relating to privacy and cybersecurity. The Committee shall also prepare and approve the Committee report required by the rules of the U.S. Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement. The Committee shall report regularly to the Board. In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, and facilities of the Company and the authority to engage independent counsel and other advisors as it determines is necessary to carry out its duties. The Company shall provide funding required by the Committee to discharge its responsibilities, including the payment of fees and expenses of the Company's independent and internal auditors, as applicable, and fees and expenses of other advisors and consultants retained by the Committee pursuant to this Charter.

* * *

**Powers and Responsibilities of the Committee**

The powers and responsibilities of the Committee are set forth below. These are in addition to powers and responsibilities that the members of the Committee may have as directors of the Company or as members of other committees of the Board. The Company's management and independent auditor are responsible for the planning and conduct of the annual audit of the Company's financial statements and determining that the Company's financial statements are complete and accurate and prepared in accordance with United States Generally Accepted Accounting Principles ("GAAP"); such function is not the responsibility of the Committee.

* * *

**Review of Controls**

25. Review and discuss with management, and the independent auditor and internal auditor or director of internal audit (as applicable), the adequacy of internal controls and any special audit steps adopted in light of material control deficiencies that could significantly affect the Company's financial statements.

26. Review management's certification of disclosure controls and procedures and internal controls for financial reporting.

* * *

**Oversight of Risk Assessment and Management**

34. Regularly review, discuss with management, and oversee: (a) management's programs and policies to identify, assess, manage, mitigate and monitor significant business risks of the Company, including financial, operational, cybersecurity and information technology, privacy, security, business continuity, legal, regulatory and reputational risks; (b) management's risk assessment, management, mitigation and monitoring decisions, practices and activities, including the steps management has taken to monitor and control the Company's major financial risk exposures; and (c) policies and guidelines to govern the process by which risk assessment and risk management are undertaken.

35. Review, discuss with management, and oversee the Company's privacy, information technology and security and cybersecurity risk exposures, including: the potential impact of those exposures on the Company's business, financial results, operations and reputation; the programs and steps implemented by management to monitor and mitigate any exposures; the Company's information governance and information security policies and programs; and major legislative

and regulatory developments that could materially impact the Company's privacy, data security and cybersecurity risk exposure.

* * *

**Ongoing Policies**

37. Review reports from management, the independent auditor and internal auditor (if applicable) that the Company and the Company's employees, executive officers and directors are in compliance with applicable legal requirements and the Company's Code of Ethics. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Ethics.

38. Establish procedures for the (i) receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters, each as required by applicable laws, rules and regulations. Set guidelines for, and periodically review, a "whistle-blowing" policy for the Company that would (i) establish procedures to facilitate the reporting of information by an employee who observes or becomes aware of unlawful workplace conduct or conduct that may be harmful to the Company and (ii) provide protection to an employee who reports such information.

* * *

**Committee Activities**

41. On at least a quarterly basis, report to the full Board regarding matters reviewed and actions taken by the Committee and make appropriate recommendations for action by the Board. The Committee shall regularly review with the Board, as appropriate, any issues that arise within the scope of the responsibilities of the Committee as described in this Charter, including, but not limited to, issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, and the performance and independence of the independent auditor.

* * *

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

78. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and

conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

79. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

80. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

81. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, the Individual Defendants, as directors of FBRT, were direct, essential, and significant participants, collectively and individually, in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

82. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of hir or her overall role in furthering the misconduct.

83. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of FBRT, and at all times operated within the course and scope of that agency.

## FACTUAL BACKGROUND

84. FBRT is a Maryland-incorporated real estate investment trust that originates, acquires, and manages a portfolio of commercial real estate debt secured by properties throughout the United States. The Company operates through two business segments: (1) Commercial Real Estate Financing, and (2) Agency Business.

85. The Company's Commercial Real Estate Financing segment consists of the origination, acquisition, and management of commercial real estate debt investments, including first mortgage loans, subordinated mortgage loans, and mezzanine loans. This segment also invests in a range of real estate securities, including commercial mortgage-backed securities, commercial real estate collateralized loan obligation bonds, single-asset single-borrower bonds, and collateralized debt obligations.

86. On July 1, 2025, the Company acquired NewPoint Holdings JV LLC ("NewPoint"), which now comprises its Agency Business segment. Through this segment, the Company originates, sells, and services multifamily finance products offered under programs sponsored by government-sponsored enterprises and government agencies.

87. Prior to the Relevant Period, the Company paid a quarterly dividend of $0.355 per share and continued to maintain that dividend level throughout fiscal years 2024 and 2025. As a result, shareholders received quarterly dividends of $0.355 per share during both fiscal years.

88. A key metric for assessing the sustainability of a company's dividend is the dividend coverage ratio. This ratio measures the number of times a company can fund dividend payments to shareholders with its net income during a specified period. The dividend coverage ratio is determined by dividing the company's net income by the total dividends paid.

## FALSE AND MISLEADING STATEMENTS

89. On November 5, 2024, before the market opened, FBRT held its earnings call for the third quarter of 2024 (the "Q3 2024 Call") to discuss the Company's financial results and operating performance for the quarter.

90. Defendant Baglien made the following statement about the Company's dividend (which had been maintain at $0.355 per share of common stock):

> While GAAP and distributable earnings did not cover our quarterly dividend***, we remain confident that our dividend level accurately reflects our portfolio's long-term stabilized earnings potential and we're comfortable with the current level***.

91. The Q3 2024 Call featured the following exchange between an analyst and Defendants Baglien and Byrne:

> **Analyst:** And then kind of last one for me, maybe on dividend coverage. We understand the lag between repayments and originations and that flowing through to net interest income. But how long do you think it takes to redeploy your capital back into loans to the point where your DE is fully covering dividends?
>
> **Defendant Baglien:** Yes, Tom. This is really an REO story. As soon as we get the REO gone and get it back into loans, we're back at coverage. This is -- we largely expected there to be a little bit of noise in the numbers as we cycled through kind of this REO and get it sold. But we're -- we could not be more confident in the earnings power of the platform once we get through this and stabilize. The answer is we want to get there as fast as we can.
>
> Obviously, the market is going to dictate that timing as much as we are. I would have told you 70 basis points ago on the 10-year that we were going to get through it a little bit faster. Things might slow a little bit here, but we'll get through it all. We will get back there. And obviously, the goal is to get back there as soon as possible. But this is entirely an REO conversation, not a lack of investable or originate able opportunities.
>
> **Defendant Byrne**: And Tom, sorry to pile on, Mike and I talk about this every day, so we're all like-minded on this. ***We and our Board set our dividend policy based on our earnings power look. And we like to look at that not over like a quarter at a time, but what the earnings power of the company is***. And so whether that takes one quarter or takes a little longer, not really a consideration. And as far as REO as well, remember, we have $350 million of cash. ***We have a lot more earnings power than we're demonstrating now, and we feel confident in the level of our dividend***.

92. On February 14, 2025, before the market opened, FBRT held its earnings call for the fourth quarter of 2024 (the "Q4 2024 Call"). Prior to the call, on December 16, 2024, FBRT announced a fourth-quarter 2024 dividend of $0.355 per share, maintaining the same quarterly dividend rate the Company had consistently paid in recent periods.

93. Defendant Byrne made the following statement during the Q4 2024 Call:

> ***While we did not reach dividend coverage this quarter, we believe that our current dividend level is appropriate given the future earnings potential embedded in our REO and non-performing loans.***

94. Defendant Baglien made the following statement during the Q4 2024 Call:

> Our REO and non-performing loans will continue to impact distributable earnings in the short term. As we continue to resolve REO and put that equity back to work, we believe we could generate an additional $0.25 to $0.30 to our distributable earnings on an annual basis. ***While that may take a few more quarters to fully resolve, we are confident that our earnings power is within range of our current dividend level***.

95. On July 31, 2025, before the market opened, FBRT held its earnings call for the second quarter of 2025 (the "Q2 2025 Call"). Prior to the call, on June 11, 2025, the Company announced a second-quarter 2025 dividend of $0.355 per share of common stock. At the outset of the Q2 2025 Call, Defendant Byrne acknowledged that Defendants "suspect the market is focused on," among other issues, "our current dividend coverage."

96. Defendant Byrne made the following statement during the Q2 2025 Call:

> Our portfolio of post-interest rate hike loan originations was 56% of our portfolio at quarter end and meaningfully ahead of our peers. This reflects how active we have been in the market over the past 2.5 years. Distributable earnings were $0.27 per fully converted share. ***We believe there is a clear path to growing this to a level that supports our dividend. Jerry will lay this out in detail momentarily***.

97. Defendant Baglien made the following statement regarding the Company's ability to maintain the $0.355 per share dividend paid to shareholders during the quarter:

> FBRT reported GAAP earnings of $24.4 million or $0.21 per fully converted

> common share. Distributable earnings for the quarter was $29 million or $0.27 per fully converted share. ***Our Board determined it was appropriate to maintain the second quarter dividend at the current level of $0.355.***
>
> We believe there are 3 key drivers to get us to dividend coverage. ***First, we plan to call several CLOs that are now past their reinvestment periods and are no longer providing optimal leverage. We believe this will generate approximately $0.04 to $0.06 per share quarterly by creating liquidity and freeing up equity in those CLOs for us to reinvest***.
>
> Second, we expect to reinvest the equity currently allocated to our REO portfolio and REO financings. As we continue to sell assets and recycle that capital into new originations, ***we estimate this could contribute approximately $0.08 to $0.12 per share per quarter to distributable earnings.***
>
> ***Third and lastly, we expect the contribution from NewPoint to grow meaningfully over time. Once it begins to reach scale on origination volume, BSP loan servicing is integrated, and we realize the cost savings from the platform synergies, we believe NewPoint can deliver an 8% ROE or better, and that would generate approximately $0.08 per share in quarterly earnings contribution.***

98. On October 30, 2025, FBRT held its earnings call for the third quarter of 2025 (the "Q3 2025 Call"). Prior to the call, on September 15, 2025, the Company announced a third-quarter 2025 dividend of $0.355 per share of common stock, maintaining its existing quarterly dividend rate.

99. Defendant Baglien made the following statement during the Q3 2025 Call:

> ***In regards to the dividend under coverage, the key drivers we outlined last quarter to move toward coverage remain intact, and I'll highlight some of the progress we've made on those fronts***. At the end of the third quarter, we issued an approximately $1.1 billion CRE CLO, which settled on October 15. The transaction carries an initial advance rate of 88% and a weighted average interest cost of SOFR plus 1.61%, before accounting for discount and transaction costs. The CLO has a 30-month reinvestment period, meaning it should be an accretive liability for us for 3 to 5 years.
>
> In conjunction with the new CLO, we also financed approximately $500 million of assets with the money center bank. Together, these financings allowed us to call several older CLOs, generating roughly $250 million of cash and reduce our financing cost by about 65 basis points. Combined, these transactions are expected to add an incremental $0.05 to $0.07 per share of quarterly earnings once this cash is deployed into new assets.

> We expect to begin realizing this benefit in early 2026.
> Mike will provide more details on our REO portfolio, but we did reduce our REO balance this quarter through an additional asset sale. We continue to sell REO and redeploy that capital into new originations. ***We estimate this activity can contribute approximately $0.08 to $0.12 per share per quarter to distributable earnings over time. We also saw a strong contribution from NewPoint in its first full quarter as part of FBRT, generating $9.3 million of distributable earnings or $0.09 per fully converted share.***

100. Defendant Comparato concluded his remarks during the Q3 2025 Call with the following statement:

> Finally, I'll spend a minute on NewPoint. The acquisition of NewPoint has made us one of, if not the largest middle market lenders in the country with over 300 employees. ***We are extremely encouraged by the origination activity we saw in the third quarter. We are already seeing meaningful cross-selling and collaboration between the platforms and my confidence and conviction in the acquisition continues to grow.***
>
> As we have spent more time with the company, it is clear that we have some of the most talented people in the industry, including, but not limited to, Jerry Borger, our President of Agency Lending; Rob Rozak, the President of Affordable; and Eric Lindauer, our Head of Healthcare and FHA Lending. These leaders are bringing new products to our platform and give us yet another offering to our clients from what we've already believed to be a market-leading product offering. This is truly just the beginning of what NewPoint can bring to FBRT.
>
> As Rich mentioned, the third quarter was very much a construction zone for FBRT. ***We are now highly focused on playing offense. Our integration plan with NewPoint is on track, and we firmly believe FBRT has more tailwinds than headwinds. We are excited to continue the path to dividend coverage***.

101. The foregoing statements were materially false and/or misleading because they misrepresented and omitted adverse facts concerning the Company's business, operations, and prospects. These facts were known to Defendants or, at a minimum, were recklessly disregarded by them. FBRT's dividend was a fundamental component of its business, as a stable dividend yield was material to investors and the prospect of maintaining or increasing dividends is a primary reason investors purchase REIT securities. Accordingly, senior management had access to,

monitored, and was aware of information bearing on FBRT's dividend sustainability and underlying operations when making the statements alleged herein. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants recklessly overstated FBRT's prospects; (2) Defendants recklessly overstated FBRT's ability to maintain its $0.355 per share dividend; and (3) as a result, Defendants' statements regarding FBRT's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH IS REVEALED**

102. On February 10, 2026, after the market closed, the Company issued a press release entitled "Franklin BSP Realty Trust Announces Leadership Transition." In that release, the Company stated that it "announced that the Board of Directors of the Company has appointed Michael Comparato, currently the Company's President, as Chief Executive Officer and Brian Buffone as President, effective immediately. Richard Byrne will continue as Chairman of the Board of Directors."

103. On this news, FBRT's stock price declined 0.97% on February 11, 2026.

104. On February 11, 2026, after the market closed, the Company issued a press release entitled "Franklin BSP Realty Trust, Inc. Announces Fourth Quarter and Full Year 2025 Results" (the "Q4 Release"). In the Q4 Release, the Company preliminarily reported the following financial results, which reflected a decline in operating performance compared to the prior year:

> Reported GAAP net income of $18.4 million and $84.1 million for the three and twelve months ended December 31, 2025, respectively, compared to $30.2 million and $92.4 million for the three and twelve months ended December 31, 2024, respectively. Reported diluted earnings per share ("EPS") to common stockholders of $0.13 and $0.64 for the three and twelve months ended December 31, 2025, respectively, compared to $0.29 and $0.82 for the three and twelve months ended December 31, 2024, respectively.

105. The Q4 Release quoted Defendant Comparato as stating the following about the Company's business performance, during which he also announced a dividend cut:

> 2025 was a year of transition for FBRT. We have diversified our business lines with the NewPoint acquisition and we have been sorting through the remaining legacy 2021 and 2022 assets. ***While we have managed through the credit cycle with minimal losses, it has taken longer to resolve and sell the real estate than we originally planned. This has led to over-distributing capital to investors. In order to stabilize our book value and match the earnings power of our company to distributions, our Board reset the quarterly dividend to $0.20.*** Our earnings power to support a meaningfully higher dividend remains unchanged, and the team is working tirelessly to position us for higher earnings. In the near term, our priority is delivering durable book value growth and matching our yields to our distributions.

106. On February 12, 2026, before the market opened, the Company conducted its earnings call for the fourth quarter of 2025 (the "Q4 2025 Call").

107. Defendant Comparato made the following disclosure during the Q4 2025 Call:

> Now on to the company. ***For several quarters, we have discussed our earnings under covering our dividend. After a thoughtful analysis, we decided it was no longer prudent to sacrifice book value to pay that dividend. Accordingly, management has recommended and the Board has approved a reset of the quarterly dividend to $0.20 per common share beginning the first quarter of 2026. The company continues to have earnings power to support a meaningfully higher dividend than $0.20***. That has not changed. But in the near term, rather than returning capital to shareholders by over distributing, we want to stabilize our book value and better match our current earnings to our dividend.
>
> Our priorities are sustainable dividend coverage, book value growth and building more consistent durable earnings. The dividend reset is driven by several factors. The recent declines in SOFR, the timing of our originations and repayments and the overall size of our loan portfolio has impacted short-term returns. In addition, spreads are at multi-decade tights, which means that new loans coming into the portfolio are generally making lower returns than loans that are paying off. REO liquidations are taking longer than originally anticipated, keeping equity locked in underperforming investments.

108. On this news, the price of FBRT stock fell $1.44 per share, or 14.18%, to close at $8.71 on February 12, 2026.

## SHARE REPURCHASES DURING THE RELEVANT PERIOD

109. During the Relevant Period, the Individual Defendants directed the Company to repurchase its common stock at artificially inflated prices. From October 2025 through February 2026, the Company repurchased approximately 1.9 million shares of its common stock for an aggregate purchase price of approximately $19.1 million.

110. According to the Form 10-K filed on February 25, 2026 (the "2025 Form 10-K"), between October 1, 2025 and October 31, 2025, the Company repurchased 636,738 shares of its common stock at an average price of $10.74 per share, resulting in an aggregate expenditure of $6,838,566.

111. As the Company's stock was allegedly trading at artificially inflated prices during the Relevant Period and closed at $8.71 per share on February 12, 2026 following the corrective disclosures, the Company overpaid by approximately $1,292,578 for shares repurchased between October 1, 2025 and October 31, 2025.

112. According to the 2025 Form 10-K, between November 1, 2025 and November 30, 2025, the Company repurchased 414,335 shares of its common stock at an average purchase price of $10.02 per share, for an aggregate cost of approximately $4,151,637.

113. As FBRT's stock price closed at $8.71 per share on February 12, 2026, the Company paid approximately $542,779 more for shares repurchased between November 1, 2025, and November 30, 2025, than it would have paid at that price.

114. According to the 2025 Form 10-K, between December 1, 2025, and December 31, 2025, the Company repurchased 320,000 shares of its common stock at an average purchase price of $10.02 per share, for an aggregate cost of approximately $3,376,000.

115. As FBRT's stock price closed at $8.71 per share on February 12, 2026, the Company paid approximately $588,880 more for shares repurchased between December 1, 2025, and December 31, 2025, than it would have paid at that price.

116. According to the 2025 Form 10-K, subsequent to December 31, 2025, and through February 19, 2026, the Company repurchased 538,218 shares of its common stock at an average purchase price of $8.85 per share, resulting in an aggregate cost of approximately $4,753,229.[2]

117. As the Company's stock was worth only $8.71 per share, its closing price on February 12, 2026, the Company overpaid by approximately $75,351 in repurchasing its own shares between January 1, 2026 and February 19, 2026.

118. Thus, in total, during the Relevant Period, the Company overpaid by approximately $1.9 million in repurchasing its own common stock.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

119. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

120. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

121. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

[2] Upon information and belief, these repurchases occurred during the Relevant Period.

122. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

123. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

124. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

125. The Company's Board is currently comprised of six members: Defendants Augustine, Byrne, Dumars, McDonough, Ortale, and Tuppeny (the "Demand Director Defendants"). Thus, Plaintiff is only required to show that a majority of the Demand Director Defendants, i.e., 3, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

126. Each of the Demand Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

127. Each of the Demand Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

128. Additionally, the Demand Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Byrne**

129. Defendant Byrne is not disinterested or independent, and therefore, is incapable of considering demand because, Byrne, as the Chairman of the Board and former CEO of the Company until February of 2026, derives substantial compensation in his role with the Company making him not disinterested or independent.

130. The financial benefits received by Byrne renders him incapable of impartially considering a demand to commence and vigorously prosecute this action. Moreover, he solicited the 2025 Proxy Statement, which contained materially false and misleading statements and omissions and resulted, among other things, in the re-election of himself and the Director Defendants to the Board, thereby enabling them to continue breaching their fiduciary duties to FBRT.

131. Notably, the Company does not recognize Defendant Byrne as an independent director. He is also named as a defendant in the Securities Action.

132. As such, Defendant Byrne cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendants Ortale, Dumars, McDonough, and Tuppeny**

133. Defendants Ortale (Chair), Dumars, McDonough, and Tuppeny are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the

purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge, these Defendants caused these improper statements.

134. For these reasons, Ortale, Dumars, McDonough, and Tuppeny breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**All Demand Director Defendants**

135. The Demand Director Defendants, as officers and members of the Board, were and are subject to the Code of Business Conduct and Ethics as well as the Company's Corporate Governance Guidelines (the "Codes"), which go well beyond the basic duties required by applicable laws, rules, and regulations. Specifically, the Codes require Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Demand Director Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Demand Director Defendants breached the Company's Codes, face substantial liability, and are not independent or disinterested, making demand upon them futile.

136. Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Demand Director Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best

interests of the Company and the shareholders. These conflicts of interest precluded the Demand Director Defendants from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

137. FBRT has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Demand Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FBRT any part of the damages FBRT suffered and will continue to suffer, thereby. Thus, any demand to the Demand Director Defendants would be futile.

138. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Demand Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Demand Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

139. The acts complained of herein constitute violations of fiduciary duties owed by FBRT's officers and directors, and these acts are incapable of ratification.

140. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of FBRT. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the ''insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of FBRT, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

141. If there is no directors' and officers' liability insurance, then the Directors will not cause FBRT to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

142. Thus, for all of the reasons set forth above, all of the Demand Director Defendants, and, if not all of them, certainly at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## COUNT I

**Against the Individual Defendants**
**For Breach of Fiduciary Duties**

143. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

144. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of FBRT's securities.

145. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FBRT has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147. Plaintiff, on behalf of FBRT, has no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants**
**for Violating Section 14(a) of the Exchange Act**

148. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

149. Pursuant to Section 14(a) of the Exchange Act, "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for

the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

150. Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits proxy statements from containing "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

151. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxies, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

152. The false and misleading Proxy statements caused the re-election of several Individual Defendants to the Board, allowing them to continue breaching their fiduciary duties to FBRT.

153. As a direct and proximate result of the material misrepresentations and omissions in the Proxy Statements filed during the Relevant Period by the Individual Defendants, the Company suffered damages.

154. Plaintiff, on behalf of FBRT, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants
For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder**

155. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

156. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

157. The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by: (i) employing devices, schemes, and artifices to defraud; (ii) making untrue statements of material fact and omitting material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon FBRT in connection with the Company's repurchases of its own stock during the period of wrongdoing.

158. The Individual Defendants, acting individually and collectively and through the use of interstate commerce and the mails, engaged in a continuous fraudulent scheme that operated as a deceit upon FBRT. In furtherance of that scheme, Defendants made materially false or misleading statements and omissions, acting intentionally or with severe recklessness, and employed devices and artifices to defraud in connection with the purchase and sale of FBRT stock. This conduct deceived FBRT and its stockholders regarding the Company's growth and business prospects, artificially inflated and maintained FBRT's stock price, and caused the Company to

repurchase its own shares at artificially inflated prices, resulting in losses once the truth became known. Throughout the period of wrongdoing, Defendants were in possession of material, nonpublic information.

159. As senior officers and directors of the Company, the Individual Defendants were directly responsible for, and are liable for, the improper statements made during the period of wrongdoing.

160. Throughout the period of wrongdoing, the Individual Defendants acted with scienter, either with intent to deceive, manipulate, or defraud, or with severe recklessness. The material misstatements and omissions were either known to Defendants or were so obvious that Defendants must have been aware of them. Defendants further had a continuing duty to disclose material information that rendered their prior statements materially false or misleading.

161. The Individual Defendants made false or misleading statements and omissions in connection with FBRT's repurchases of its own stock.

162. As a direct result of the Individual Defendants' misconduct, FBRT paid artificially inflated prices for its own common stock and suffered losses when the previously concealed facts regarding the wrongdoing became known, causing ongoing damages to the Company.

163. The Company would not have repurchased its own securities at the prices paid, or at all, absent the artificial inflation caused by the Individual Defendants' false or misleading statements.

164. As a direct and proximate result of the Individual Defendants' misconduct, FBRT suffered damages in connection with its stock repurchases during the period of wrongdoing, rendering Defendants liable under Section 10(b) of the Exchange Act and SEC Rule 10b-5.

165. Plaintiff, on behalf of FBRT, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants**
**For Unjust Enrichment**

166. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

167. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information and facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of FBRT.

168. Each of the Defendants received payment from FBRT, in the form of either salary or director fees while actively breaching their fiduciary duties to FBRT.

169. All the payments and benefits provided to Defendants were at the expense of FBRT. The Company received no benefit from these payments.

170. Plaintiff, as a shareholder and a representative of FBRT, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

171. Plaintiff, on behalf of FBRT, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants**
**For Waste of Corporate Assets**

172. Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

173. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused FBRT to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

174. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

175. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, FBRT has sustained and will continue to sustain significant damages.

176. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

177. Plaintiff, on behalf of FBRT, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that the Plaintiff may maintain this action on behalf of FBRT and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to FBRT;

c) Determining and awarding to FBRT the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of

the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve FBRT's corporate governance and internal procedures to comply with applicable laws and to protect FBRT and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 20, 2026

**KUEHN LAW, PLLC**

*/s/Justin Kuehn*
Justin A. Kuehn
53 Hill Street, Suite 605
Southampton, NY 11968
Phone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*

**VERIFICATION**

I, John M. Schuberth, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Franklin BSP Realty Trust, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 19th day of August 2026.

John M. Schuberth
John M. Schuberth (Aug 19, 2026 12:12:05 PDT)
John M. Schuberth